UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF INDIANA
FORT WAYNE DIVISION

| ALTERMEASE M. GUY, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Case No.: 1:04-CV-295 |
| CITY OF FORT WAYNE, 911 COMMUNICATIONS | ) |
| Defendants. | ) |

## OPINION AND ORDER

### I. INTRODUCTION

Altermease Guy, who is *pro se*, is suing her former employer, the City of Fort Wayne, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, alleging that she was terminated because she is African American. (Docket # 1.) More specifically, Guy claims that her supervisor harbored animus against her and persuaded police officers to lodge false complaints in order to get her fired.

The city moves for summary judgment (Docket # 32), arguing that Guy fails to show that (1) she was performing her job satisfactorily at the time she was fired; or that (2) a similarly situated employee was treated more favorably; or (3) the reason the City gave for firing her was a lie. Because we find the City's arguments persuasive, its motion will be GRANTED.[1]

---

[1] The City also moves to strike various materials attached to Guy's response to the motion for summary judgment and to her supplemental response, arguing that all of these materials, other than two affidavits, are "unverified, unauthenticated, and riddled with incomplete, unreliable, and speculative statements and hearsay." (Br. in Supp. of Mot. Pursuant to N.D. Ind. L.R. 56.1 to Strike Pl.'s Resp. to Def.'s Mot. for Summ. J. & Designation of Materials in Supp. of Resp. & to Strike the Supplement to Pl.'s Resp. to Def.'s Mot. for Summ. J. & Designation of Materials in Supp. of Resp. 4.) In addition, the City points out that Guy's supplemental response was filed three days late. While the City's arguments are well-taken, the Court will deny the motion to strike as moot since Guy loses even when we consider her designated evidence and her late supplemental response.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

From 1979 until 2002, Guy worked as a dispatcher with the City's 911 Communication Department, where her responsibilities included dispatching police officers and firefighters in response to 911 calls. (Compl. ¶ 2; V.S. of Susan Rarey ¶ 2.) During her employment, Guy had various supervisors, but was supervised by Susan Rarey for approximately the last three to four years of her employment. (Rarey V.S. ¶ 2.) Rarey reported to Steven Smith, the City's Director of Communications. (Rarey V.S. ¶ 3.)

In early February 2002, Fort Wayne Police Department Deputy Chief Douglas Lucker informed Smith that his officers had "serious safety concerns and complaints" about Guy and that "many of his officers had lost all confidence in [Guy's] abilities." (V.S. of Steven Smith ¶ 7.) Smith suggested to Lucker that the officers put their complaints in writing since he could not investigate anonymous complaints. (Smith V.S. ¶ 7.) Due to the seriousness of the oral complaints, however, Smith directed Rarey to remove Guy from the main police dispatch channel pending receipt of the written complaints.[3] (Smith V.S. ¶ 8; Rarey V.S. ¶ 3.)

On February 17, 2002, Smith received a written complaint signed by three patrol officers expressing their displeasure over Guy's response to two incidents occurring on February 5, 2002, which they believed jeopardized their safety.[4] (Def.'s Mot. for Summ. J. & Designation of

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Guy, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] Guy contends that although she was taken off the main dispatch channel purportedly due to officer safety concerns, she was subsequently placed on the seatbelt enforcement channel and the information channel, which are likewise responsible for officer safety. (Pl.'s Resp. to Def.'s Mot. for Summ. J. & Designation of Materials in Supp. of Resp. Ex. 17.)

[4] Both Smith and Rarey allege that in their history with the Communication Department, this was the first and only time they had received written complaints from police officers against a dispatcher or other employee because of specific officer safety concerns. (Rarey V.S. ¶¶ 17-18; Smith V.S. ¶ 14.)

Materials in Supp. of Mot. for Summ. J. Ex. B.) Specifically, the officers alleged that Guy refused to obtain information for them regarding a police pursuit in an adjoining police district and that during a bank robbery in progress she did not relay information to officers and dispatched one officer to the wrong address. (Mot. for Summ. J. Ex. B.) The officers believed these types of incidents were "not unusual" for Guy. (Mot. for Summ. J. Ex. B.)

Regarding the first incident, Guy claims that she did not refuse the officers' requests; instead, she asked another dispatcher to find the information while she handled a call that was already in progress on her channel, relaying the information to the officers once the other dispatcher provided it. (Pl.'s Resp. Ex. 17.) Guy also contends that a different dispatcher handled the robbery call; therefore, the officers wrongly accused her.[5] (Pl.'s Resp. Ex. 17.) Furthermore, when another officer was allegedly approached by the three authors of the complaint, he refused to sign it, saying that he had no problem with Guy's handling of the incidents.[6] (Supplement to Pl.'s Resp. to Def.'s Mot. for Summ. J. & Designation of Materials in Supp. of Resp., Summ. of Facts.)

Shortly after providing Smith with the first complaint, Lucker gave Smith another written complaint authored by a different officer, who claimed that Guy failed to provide the officer's partner with cautionary name alerts for a particular suspect they had detained. (Mot. for Summ J. Ex. A.) It is a written policy of the Communication Department that all cautionary name alerts be broadcast when an employee is dispatching calls or accessing name file information for an

---

[5] Guy supports her contentions with transcripts that she made of the audio recordings of those dispatches. (Pl.'s Resp. Exs. 9-10.)

[6] Guy also contests an allegation in the written complaint that one of the officers has heard her tell other officers to stand by while she does her nails, contending that this is a lie. (Supplement to Pl.'s Resp., Summ. of Facts.)

officer.[7] (Rarey V.S. ¶ 7; Mot. for Summ. J. Ex. C.)

After investigating the officers' complaints, Rarey concluded that Guy had failed to properly respond to the officers and had violated City policies and procedures. (Rarey V.S. ¶¶ 4-7.) Rarey reported her findings to Smith, who felt "very troubl[ed]" by the officers' purported lack of confidence in Guy because "[a] dispatcher must work regularly with police officers and firefighters, who must have confidence in the dispatcher's ability to competently perform her job duties. Their safety and the safety of citizens is in the dispatcher's hands." (Smith V.S. ¶ 15.) He believed that the City could not retain an employee who had lost the confidence of a "significant number" of officers. (Smith V.S. ¶ 15.) Accordingly, Rarey and Smith contacted the City's Human Resource Department and City Attorney Carol Taylor to review the matter. (Smith V.S. ¶ 16; Rarey V.S. ¶ 11.)

In addition to reviewing the officer complaints, Taylor examined Guy's prior disciplinary records, which included discipline imposed not only by Rarey, but also by Rarey's predecessors. (V.S. of Carol Taylor ¶¶ 5-10.) For example, in October 1999, the Communication Department recommended Guy's discharge; however, the hearing officer did not uphold the recommendation.[8] (Mot. for Summ. J. Ex. H; Rarey V.S. ¶ 12(b).) Other disciplinary actions

---

[7] Guy also received written reprimands in March for incorrectly entering an address and for having a police unit stand by while she was on a personal phone call. (Mot. for Summ. J. Exs. D, E.) Regarding the latter offense, the officer involved signed an affidavit saying he did not "come forward to complain about Altermese Guy," and although he "was contacted by the Communications Dep[artment] and asked what had occurred . . . [he] did not intend to file a complaint in the matter." (Aff. of David Benschneider.)

[8] Although he did not uphold the recommendation, the officer noted:
"In my view, management has good reason to be concerned about your work performance, which appears to have regressed in recent years. I trust you will strive to improve your job performance. The citizens of this City depend on competent service from dispatchers whenever they make a call to your department. Their welfare could someday depend on a dispatch to you."
(Mot. for Summ. J. Ex. H.)

4

relating to violations of City policy and/or to officer safety included four suspensions,[9] seven written reprimands, five "counselings," one "coaching," and three verbal reprimands.[10] (Mot. for Summ. J. Ex. H; Rarey V.S. ¶ 12.) Guy also had various other counselings and reprimands relating to tardiness and excessive personal phone calls.[11] (Mot. for Summ. J. Ex. H; Rarey V.S. ¶ 12.)

After reviewing with Rarey and Smith the officer complaints, Guy's prior disciplinary history, and the summary of Rarey's investigation, Taylor agreed that Guy should be discharged. (Taylor V.S. ¶¶ 4, 14-15; Rarey V.S. ¶ 12; Smith V.S. ¶ 19.) A Notice of Proposed Termination was prepared, and Guy was suspended pending the predeprivation hearing. (Rarey V.S. ¶¶ 13-14.) At the hearing, Guy was represented by counsel and presented her own witnesses and evidence. (Taylor V.S. ¶ 18.) Several police officers testified regarding their lack of confidence in Guy's abilities. (Hunter V.S. ¶ 15; Andrews V.S. ¶ 18.) On July 8, 2002, the hearing officer issued a decision upholding the recommendation for discharge, and Guy's employment was terminated. (Mot. for Summ. J. Ex. I; Taylor V.S. ¶ 20.)

Guy now alleges that she was terminated because she is African-American, pointing specifically to Rarey as harboring such animus against her. Yearly employee evaluations dating

---

[9] An additional suspension was recommended, but ostensibly a delay by the Law Department in setting the hearing caused it to be dismissed. (Rarey V.S. ¶ 12(j).)

[10] The disciplinary actions date from 1986 to 2001. (Rarey V.S. ¶ 12.) Despite those disciplinary actions, Guy points to positive evaluations as evidence of her satisfactory performance.

[11] Guy claims that according to City policy 7.5, all disciplinary actions not involving suspensions or discharges are considered inactive after two years; furthermore, a former Chief of Communications allegedly surrendered personnel files in 2000 for the dispatchers "to throw away or whatever." (Pl.'s Resp. Ex. 17.)
Guy also contends that she never received four "Job Coaching Forms" and that the forms were created by Rarey as a "pretext for termination," and points to the fact that she and Rarey never signed them as required by City policy. (Pl.'s Resp. Exs. 12, 17.)

5

from 1987 demonstrate that until Rarey became her supervisor, Guy's performance was generally rated as satisfactory or above. (Pl.'s Resp. Ex. 3.) Guy also contends that she has always scored in the high 90's on biannual tests of her knowledge of the police information channels. (Pl.'s Resp. Ex. 17.) Furthermore, a letter written by a former supervisor, who worked with Guy for eighteen years, opined that Guy was a "dedicated, capable, and caring employee." (Pl.'s Resp. Ex. 14.)

Guy claims that Rarey has "been carrying a grudge" against her since beginning her tenure as Guy's supervisor, allegedly because Rarey felt that she was initially turned down for the position due to something Guy said. (Pl.'s Resp. Ex. 17.) Guy believes her termination was sparked by a particular incident occurring just prior to the officers' complaints, when Guy "utilized the chain of command and went over Susan Rarey's head." (Pl.'s Resp. Ex. 17.) More specifically, after Rarey denied Guy a vacation bid, Guy spoke to Rarey's superior, DC John Grannan, who then advised Rarey to grant the bid. (Pl.'s Resp. Ex. 17.) Rarey allegedly told Guy that if she talked to Grannan again, she would be written up for insubordination. (Pl.'s Resp. Ex. 17.)

Guy contends that the officers who wrote the complaints frequently spend several hours socializing with Rarey at the dispatch center and that Lucker is a "very close friend and fishing partner" with Rarey's police officer husband. (Supplement to Pl.'s Resp., Summ. of Facts.) Furthermore, these officers were allegedly "rude and disrespectful" towards Guy, leading her to complain to her supervisor about their behavior. (Supplement to Pl.'s Resp., Summ. of Facts.)

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### IV. DISCUSSION

A plaintiff alleging employment discrimination can contest summary judgment by using either the direct or indirect method of proof.[12] *King v. Preferred Technical Group*, 166 F.3d 887, 891-92 (7th Cir. 1999). The direct method requires the plaintiff to produce enough evidence, whether direct or circumstantial, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), to create a triable issue of whether the adverse employment action had a discriminatory

---

[12] The following legal standards apply equally to Title VII and § 1981 claims. *See Blise v. Antaramian*, 409 F.3d 861, 866 n.4 (7th Cir. 2005).

motivation.[13] *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997).

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *King*, 166 F.3d at 891-92. Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). For Title VII claims, the *prima facie* case requires four showings: (1) the plaintiff was a member of a protected class; (2) the plaintiff was meeting the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) a similarly situated employee who was not a member of the plaintiff's protected class was treated more favorably. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995); *see also Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

Here, the City concedes that Guy has enough evidence to support the first and third prongs of her *prima facie* case–she is African American and was terminated by the City. Accordingly, our discussion focuses on whether Guy raises a genuine issue of

---

[13] Direct evidence is essentially "an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). In the absence of direct evidence, circumstantial evidence must compose "a convincing mosaic of discrimination against the plaintiff." *Troupe*, 20 F.3d at 737. This circumstantial evidence is of three general types: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination. *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003).
      Here, Guy does not allege any direct or circumstantially direct evidence of racial discrimination by the City. Thus, we proceed exclusively under the *McDonnell Douglas* framework.

material fact with regard to the second and fourth prongs and whether Guy can show that the City's proferred reason for terminating her was merely a pretext for racial discrimination.

### A. Guy Fails to Establish a *Prima Facie* Case of Racial Discrimination

*1. Guy Fails to Show that She Was Meeting the Legitimate Expectations of the City at the Time of Her Termination*

To demonstrate her satisfactory performance, Guy largely relies on her past performance evaluations, which reveal a history of positive evaluations that suddenly turned negative once Rarey became her supervisor. The evaluations, however, do not create a genuine issue of material fact because the issue is not Guy's *past performance*, but whether she was performing well *at the time of the adverse employment action*. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 315, 328-29 (7th Cir. 2002) ("We are unpersuaded by Peele's argument that evidence of her poor job performance must be balanced against the 'favorable performance reviews, raises, and promotions' she received during her eight-plus years with the company."); *Staples v. Pepsi-Cola Gen. Bottlers, Inc.*, 312 F.3d 294, 299-300 (7th Cir. 2002).

Likewise, the letter from Guy's former supervisor indicating that Guy was a "dedicated, capable, and caring employee" is "insufficient to create a material issue of fact as to whether [Guy] was meeting her employer's legitimate expectations at the time she was terminated." *Peele*, 288 F.3d at 329; *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . . give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance.").

Regarding her job performance *at the time she was terminated*, Guy contends that there was no basis in fact for the officer's first written complaint and Rarey's subsequent conclusion

9

about the incidents. She points to transcripts that she made of the dispatch recordings as evidence that she acted appropriately. But even assuming that Guy's unverified, unsworn transcripts reveal that her performance was satisfactory, we still have the second letter of complaint and subsequent affidavit of the fourth officer, claiming that Guy did not give out call out signals to the officers as required by City policy. This letter is uncontroverted; in fact, Guy ostensibly admits to committing the error. (Reply Br. of the City of Fort Wayne in Supp. of its Mot. for Summ. J. 8-9.) Also uncontroverted are the two written reprimands Guy received around the same time.[14] Thus, even when we give Guy every benefit of the doubt, the unrefuted evidence demonstrates that she was violating City policy and was not, therefore, meeting the City's legitimate expectations when she was recommended for termination. *Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001) ([B]y putting . . . requirements in [the employer's] Work Rules, there can be no claim that these were not legitimate expectations of the company.")

*2. Guy Fails to Point to a Similarly Situated Employee Who Was Treated More Favorably*

To establish that another employee was similarly situated, a plaintiff must demonstrate that "there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citing *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 728 (7th Cir. 2001); *Radue*, 219 F.3d at 618; *Spath v. Hayes Wheel's Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000)). In that regard, a plaintiff must show that another employee is "similarly situated with respect to performance, qualifications, and conduct," which usually means that the employees "dealt with the same supervisor, were subject

---

[14] Although Guy provides evidence that the officer involved in one of the reprimands did not wish to file a written complaint against her, she seemingly does not dispute that the incident occurred.

to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.

Here, Guy names two white employees as similarly situated to her but who were treated more favorably by the City–Larry Clark and Tessie Hall.[15] Guy claims that dispatcher Clark regularly brought knives to work and also gave his co-workers knives as Christmas gifts. Guy claims that Clark's actions made her and other employees feel unsafe and, more importantly, violated City policy B.2.l, which provides for immediate discharge of an employee who possesses a weapon without authorization. (Pl.'s Resp. Ex. 11.)

Guy, however, fails to demonstrate how Clark was similarly situated to her. For example, she does not produce any evidence that she and Clark were under the same supervisor. *See Radue*, 219 F.3d at 617-18. Furthermore, it cannot be said that Clark's purported offending conduct is similar to Guy's, given that he violated a different policy provision. *Id.* In addition, Guy does not provide any evidence that Clark was not subjected to discipline for his conduct. In fact, Guy fails to even establish that Clark's conduct violated City policy, as she points to no evidence that Clark's knife was an unauthorized weapon.

As to Hall, we assume *arguendo* that she was a similarly situated employee,[16] although

---

[15] Guy also provides a "Chronicle of Events" for the years 1996-2000, which ostensibly summarizes policy violations committed by other Communication Department employees, and provides a separate list of the "[d]ates of offenses, dispatcher, sex and race, and policy violation code–same codes used in my termination." (Pl.'s Resp. Ex. 6.) Even assuming that the offenses committed were similar to those committed by Guy, which is a stretch given the brevity of the descriptions, Guy utterly fails to demonstrate how these "offenders" were otherwise similarly situated to her–for example, she fails to show that these employees held the same positions as her, had the same supervisors, and whether they were ultimately disciplined.

[16] The City briefly argues that the two are not similarly situated because Hall was a call taker and Guy was a dispatcher and because officer complaints were not lodged against Hall. Both Hall and Guy, however, were subject to the same standards, namely the City policy provisions for the Communication Department, and apparently both

even here Guy fails because she does not show that Hall was treated more favorably. In fact, both Hall and Guy were recommended for termination within a few days of each other; however, Hall ultimately bid upon and was granted another position with the City before the hearing officer issued his opinion regarding her discharge. (Mot. for Summ. J. Ex. D, J; Rarey V.S. ¶¶ 25-27, 30; Taylor V.S. ¶¶ 23, 26; Smith V.S. ¶¶ 24-25.) Guy alleges that she was explicitly denied an opportunity to transfer, asserting that when her attorney specifically asked whether she could transfer, he was told "no, they wanted me out." Such a contention, however, is contradicted by Guy's own evidence, namely the affidavit of her attorney, which provides that "[i]t was my understanding that Ms. Guy could reapply for a position with the various departments of the City."[17] (Aff. of Thomas N. O'Malley ¶ 6.) Guy never attempted to bid on other positions. (Rarey V.S. ¶ 30; Taylor V.S. ¶ 27; Smith V.S. ¶ 26.) Thus, although Hall transferred and was not terminated, Guy has no evidence that would lead a reasonable trier of fact to believe that the City treated Hall more favorably than her.[18]

In fact, while Guy can point to no other employee who was similarly situated but who was treated more favorably, the City names Andrea Edris as a similarly situated, white employee

---

were under the supervision of Rarey. Furthermore, the City does not claim that the offending conduct of the two employees was different. Therefore, we will treat Guy and Hall as similarly situated. *Id.* (noting that "an employee need not show complete identity in comparing [herself] to the better treated employee, but [she] must show substantial similarity.").

[17] Instead, Guy's attorney was told that Guy could not forego the predeprivation hearing by transferring to another department. (O'Malley Aff. ¶ 6.) Likewise, Hall's attorney ostensibly asked if Hall could forego the predeprivation hearing and was denied. (Taylor V.S. ¶¶ 24-25.)

[18] In her "Summary of Facts," Guy also makes the unsupported and speculative assertion that "they put [Hall's] hearing on hold," during which time Hall was suspended with pay. Guy claims that her hearing was to take place soon after she received the notice and was delayed only because Guy agreed to be suspended without pay. The evidence, however, reveals that Hall's hearing was not "put on hold." (Taylor V.S. ¶25.)

who was terminated less than two months prior to Guy. Edris was recommended for discharge for violating the same City policies and procedures as Guy and for "carelessness and acts that might endanger the safety of others." (Mot. for Summ. J. Exs. N, O, P.)

**B. Even if Guy Could Make Out a *Prima Facie* Case of Racial Discrimination, She Fails to Demonstrate that Her Termination was Pretextual**

As discussed above in Part IV.A.1, the City has provided a legitimate, nondiscriminatory reason for Guy's termination–she violated City policy and created safety concerns for officers. It is now Guy's burden to demonstrate that that reason is a lie. In that regard, the focus of a pretext inquiry is on "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000); *see also Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) (*quoting Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)) (Pretext "means a dishonest explanation, a lie rather than an oddity or an error."); *Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001) ("[W]e are mindful that we are not a super-personnel board . . . and that we may not punish an employer for choices that constitute business decisions alone, no matter how unwise or mistaken they may seem to us.").

Here, Guy does not produce any evidence showing, or that would allow a jury to infer, that she was fired for any reason other than the perceived and honestly held belief by Smith, Taylor, and the hearing officer that Guy's performance had deteriorated to the point where multiple officers felt unsafe when she was working dispatch. Indeed, Guy makes no allegations that Smith and Taylor, who recommended Guy's termination, or the hearing officer who made the ultimate termination decision, harbored any racial animus toward her, nor does she offer any

evidence of pretext against these individuals. Instead, Guy's claims regarding pretext relate only to Rarey and the police officers, and she makes no allegations that these individuals were the ultimate decision makers here. *See Davis*, 368 F.3d at 783-84 ("A decisionmaker is the person responsible for the contested decision.").

At most, Guy speculates that Rarey and her police officer friends conspired, lied, and managed to get her fired by the decision makers because Rarey harbored animus against her. Speculation regarding Rarey's animus and the purported conspiracy is not good enough. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) (mere speculation that a superior developed discriminatory animus towards a subordinate female is not enough to demonstrate pretext); *Jordan v. Summers*, 205 F.3d 337, 343-44 (7th Cir. 2000) ("But without supporting facts or explanatory details, this 'perception' is merely speculation regarding . . . motives and cannot defeat summary judgment.").

Moreover, Guy's seeming "cat's paw" argument, *see Shager v. Upjohn*, 913 F.2d 398, 405 (7th Cir. 1990), fails because even if we believe Guy's speculative argument that Rarey and the officers "cooked up" evidence to get her fired, Guy never produces evidence that the decision makers simply "rubber stamped" Rarey's findings. *See Davis*, 368 F.3d at 783-84 (7th Cir. 2004) (finding that because there was no evidence that the ultimate decision maker "rubber stamped" the termination recommendation, the "cat's paw" theory is inapplicable). To the contrary, the hearing officer made his decision after conducting a thorough predeprivation hearing. Furthermore, Smith and Taylor made their recommendation of discharge after reviewing Guy's entire disciplinary record, which included numerous other disciplinary measures taken against her. *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 708 (7th Cir. 2005) (quoting *Willis v.*

*Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 2001). ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant.").

Finally, even assuming that Rarey and the officers lied, Guy's own assertions belie any connection between her race and her discharge. Stated another way, if Rarey was indeed motivated by animus to get Guy fired, this animus, by Guy's own admission, was not race related. *See Jordan*, 205 F.3d at 344 ("Discrimination laws serve only to prevent consideration of forbidden characteristics-like race-but they are not, as we have repeatedly noted, court-enforced merit selection programs."). Guy contends Rarey carried a grudge against her because she blamed Guy for not receiving the supervisor position sooner and because Guy went over Rarey's head in order to get vacation time. Thus, Guy's own arguments reveal that any alleged conspiracy was related to a personal vendetta Rarey had against her and had nothing to do with Guy's race.

## V. CONCLUSION

For the reasons given above, the City's motion for summary judgment (Docket # 32) is GRANTED. The Clerk is directed to enter a judgment in favor of the City and against Guy.[19]

SO ORDERED

Enter for June 16, 2006.

---

[19] Also pending is the City's motion to strike Guy's response to the summary judgment motion, the designation of materials in support of her response, and the supplement to her response. (Docket # 37.) Since Guy loses even if we consider those materials, the motion is DENIED as MOOT.

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge